**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

JERETH CAMACHO, derivatively on behalf of DOW INC.,

Plaintiff,

v.

JIM FITTERLING, KAREN S. CARTER, JEFFREY L. TATE, SAMUEL R. ALLEN, GAURDIE E. BANISTER, JR., WESLEY G. BUSH, RICHARD K. DAVIS, JERRI DEVARD, DEBRA L. DIAL, JEFF M. FETTIG, JACQUELINE C. HINMAN, REBECCA B. LIEBERT, LUIS ALBERTO MORENO, JILL S. WYANT, and DANIEL W. YOHANNES,

Defendants,

and

DOW INC.,

Nominal Defendant.

Case No.: 1:25-cv-12968

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## <u>INTRODUCTION</u>

Plaintiff Jereth Camacho ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Dow Inc. ("Dow" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jim Fitterling ("Fitterling"), Karen S. Carter ("Carter"), Jeffrey L. Tate, ("Tate"), Samuel R. Allen ("Allen"), Gaurdie E. Banister, Jr., ("Banister"), Wesley G. Bush ("Bush"), Richard K. Davis ("Davis"), Jerri DeVard ("DeVard"), Debra L. Dial ("Dial"), Jeff M. Fettig ("Fettig"), Jacqueline C. Hinman ("Hinman"), Rebecca B. Liebert ("Liebert"), Luis Alberto Moreno ("Moreno"), Jill S. Wyant ("Wyant"), and Daniel W. Yohannes ("Yohannes") (collectively, the "Individual Defendants," and together with Dow, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Dow, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a), of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Fitterling, Carter, and Tate for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States

Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Dow, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from January 30, 2025 through July 23, 2025, both dates inclusive (the "Relevant Period").

2. Dow is a holding company for The Dow Chemical Company and its consolidated subsidiaries, through which Dow operates all of its businesses. The Company bills itself as "one of the world's leading materials science companies," and conducts its business activities through six global business organized into three segments: (1) Packaging & Specialty Plastics; (2) Industrial Intermediates & Infrastructure; and (3) Performance Materials & Coatings. Through these operational segments, Dow operates its vast materials science company, which serves customers in a wide array of fields, including infrastructure, mobility, and various consumer applications.

3. Dow has historically differentiated itself from other materials science businesses in the eyes of investors through its provision of what it has boasted to be

an "industry-leading dividend." On numerous conference calls with investors and analysts, the Company's Chief Executive Officer ("CEO"), Defendant Fitterling, represented that the Company's "dividend is a key element of our investment thesis," and that "north of 65% of [Dow's] owners count on that dividend."

4. Recently, macroeconomic conditions have proven to be quite uncertain as the result of the imposition of novel tariffs and the large uncertainties related thereto, as well as a broader downturn in the materials science industry. Notwithstanding these difficulties, Dow represented to the investing public that it remained well positioned to wait-out these macroeconomic and tariff-related headwinds while continuing to provide its lucrative dividend. In so doing, the Individual Defendants highlighted various ostensible strengths and market advantages held by Dow, including, among other things, its purported "differentiated portfolio," its "cost-advantaged footprint," and its "industry-leading flexibility to navigate global trade dynamics." The truth, however, was that Dow was experiencing significant difficulties achieving financial results in line with consensus estimates.

5. The truth emerged on July 24, 2025, when Dow issued a press release reporting its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release reported that the Company had sustained a non-GAAP loss per share of $0.42, more than double the approximate $0.17 per

share predicted by analysts. The Q2 2025 Press Release also revealed that the Company's net sales stood at $10.1 billion, a staggering 7.3% year-over-year decline, missing consensus estimates by $130 million, and which "reflect[ed] declines in all operating segments." The Q2 2025 further reported that, *inter alia*, "net sales were down 3%, as seasonally higher demand in Performance Materials & Coatings was more than offset by declines across the other operating segments." Defendant Fitterling stated that the disappointing results were caused by "the lower-for-longer earnings environment that [Dow's] industry is facing, amplified by recent trade and tariff uncertainties." Defendant Fitterling's forecast was gloomy, and he stated that it was marked by "signs of oversupply from newer market entrants who are exporting to various regions at anti-competitive economics."

6. In a second, separate press release issued the same day (the "Dividend Halving Press Release"), it was announced that the Company would be halving its dividend, cutting it from $0.70 per share to only $0.35 per share. The Dividend Halving Press Release cited the need for "financial flexibility amidst a persistently challenging macroeconomic environment" as the reason behind the slash.

7. On this news, the price of the Company's common stock fell $5.30 per share, or approximately 17.5%, from a closing price of $30.37 per share on July 23, 2025, to a closing price of $25.07 per share on July 24, 2025.

8. During the Relevant Period, the Individual Defendants breached their

fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Individual Defendants had overstated the Company's ability to mitigate macroeconomic headwinds, particularly those generated by newly imposed tariffs; (2) in light of these headwinds, Dow's ability to maintain its dividend was likewise overstated; and (3) because of external competition and pricing pressures in conjunction with softening demand for Dow products and a consequent glut thereof in global markets, the Individual Defendants had understated the scope and severity of the foregoing on the Company's business and financial health. As a result of the foregoing, Dow's public statements were materially false and/or misleading and lacked a basis in fact at all relevant times.

9. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, one of the Individual Defendants sold Company shares at inflated prices for total proceeds of approximately $55,888.

10. Additionally, in breach of their fiduciary duties, the Individual

Defendants caused the Company to fail to maintain adequate internal controls.

11. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12. In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO and Board Chair, its Chief Financial Officer ("CFO"), and its Chief Operating Officer ("COO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Michigan (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, of the Chairman and CEO's, the CFO's, the COO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of

their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial

compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

18. Plaintiff is a current shareholder of Dow. Plaintiff has continuously owned Dow stock since first purchasing on December 4, 2020.

### Nominal Defendant Dow

19. Dow is a Delaware corporation with principal executive offices located at 2211 H.H. Dow Way, Midland, Michigan 48674. Dow's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DOW."

### Defendant Fitterling

20. Defendant Fitterling has served as the Company's CEO and Board Chair since 2018 and April 2020, respectively, and has served as a director since 2018.

21. The Proxy Statement which Dow filed on Schedule 14A with the SEC on February 28, 2025 (the "2025 Proxy Statement") stated the following about Defendant Fitterling, in relevant part:

> Mr. Fitterling is the Chair and Chief Executive Officer of Dow. Mr. Fitterling has been the Chair since April 2020 and Chief Executive Officer since August 2018. He has also served as Chair of TDCC since

April 2020 and Chief Executive Officer since July 2018. Prior to those roles, Mr. Fitterling was the Chief Operating Officer of the DowDuPont Inc. Materials Science Division from September 2017 until April 2019. Mr. Fitterling first joined Dow in 1984 and has held various other executive positions, including President, Chief Operating Officer, Vice Chair of Business Operations, Senior Vice President of Corporate Development, and President of the Plastics and Hydrocarbons businesses. Mr. Fitterling was a member of the Board of Directors of Chemical Financial Corporation from 2010 to 2019. Mr. Fitterling served as the 2021 Chair of the Board of Directors of the American Chemistry Council and was elected to serve as the 2022 and 2023 Chair of the Board of Directors of the National Association of Manufacturers.

CONTRIBUTING TO DOW'S BOARD

Mr. Fitterling played a key role in the Company's transformation, from lower-margin, commodity businesses to one more deeply focused on higher-growth, consumer demand-driven markets that value innovation—with the goal of creating the most innovative, customer-centric, inclusive, and sustainable materials science company in the world. During his more than 40-year career at Dow, Mr. Fitterling has held leadership positions in many of the Company's business units, as well as corporate development and business operations, bringing extensive business and leadership experience in the industry. In addition, he served as the business lead in Dow's successful launch of its next-generation sustainability goals. At his direction, in January 2019, Dow became a founding member of the Alliance to End Plastic Waste, an initiative to accelerate efforts to drive innovation, provide much-needed resources, and take decisive action to put an end to plastic waste in the environment. Mr. Fitterling is widely recognized for his work supporting LGBTQ+ non-discrimination and workplace equality and was inducted to the OUTstanding Hall of Fame in 2021. Mr. Fitterling is uniquely suited to facilitate the Board's governance oversight of strategic planning and enterprise risk management.

**Defendant Carter**

22. Defendant Carter has served as the Company's COO since December 3, 2024, after joining Dow in 1994 and spending the intervening years in various

leadership roles at Dow, including a stint as President of Dow's Packaging & Specialty Plastics operational segment.

23. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Carter made the following sales of Company common stock:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| February 10, 2025 | 1,449 | $38.57 | $55,888 |

Thus, in total, before the fraud was exposed, Defendant Carter sold 1,449 shares of Company common stock on insider information, for which she received approximately $55,888 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

24. The Company's Leadership website, with a separate page dedicated to Defendant Carter,[1] stated the following about her:

> Karen S. Carter is the chief operating officer of Dow Inc., a global materials science company with 2024 sales of approximately $43 billion.
>
> Carter is a member of the Company's Executive Committee, which sets strategic direction, defines priorities and establishes corporate policies for the enterprise. She has executive oversight for driving business and operational performance across the organization with a focus on strengthening customer engagement and relationships, accelerating the

[1] https://corporate.dow.com/en-us/about-dow/leadership/karen-carter.html.

commercialization of Dow's innovation pipeline, and enhancing the Company's reliability and service to customers.

Carter also has strategic oversight of Dow's business operating segments – Packaging & Specialty Plastics, Industrial Intermediates & Infrastructure, and Performance Materials & Coatings – as well as the Integrated Supply Chain, Purchasing, Information Systems, and Commercial organizations.

Carter joined Dow in 1994 and has held a broad range of leadership positions in her more than 30-year career with Dow, including business operations, sales and marketing, and human resources. Her career features international experience in Asia Pacific and extensive global business leadership positions within Building and Construction, Polyethylene, Engineering Thermoplastics, Fabricated Products, Information Technology Equipment, and Consumer Electronics.

Most recently, Carter served as President of Dow's Packaging & Specialty Plastics (P&SP) operating segment, one of the world's largest suppliers of polyethylene resins and functional polymers with more than $23 billion in annual sales. Under her leadership, P&SP has delivered value growth through asset upgrades, capacity expansions, and improved reliability. In partnership with customers and brand owners, Carter has led the development of innovative solutions that are helping to enable a circular economy. This includes the launch of circular product lines, such as REVOLOOP™ Recycled Plastic Resins and INNATE™ Precision Packaging Resins, as well as the acquisition of Circulus, a mechanical recycler, and significant strategic partnerships to secure and scale circular feedstock supply.

Prior to leading P&SP, Carter served as Dow's Chief Human Resources Officer and Chief Inclusion Officer, where she successfully institutionalized a culture where all employees can grow and thrive, thereby fully contributing to Dow's business strategy and long-term value growth. Carter continues to be an advocate for inclusion, diversity and equity by serving on Dow's President's Inclusion Council and as the executive sponsor of the Global African Affinity Network, Dow's employee resource group representing colleagues of African heritage as well as allies.

> Carter is on the board of directors for the Great Lakes Bay Region Boys and Girls Clubs of America. She is also on the board of directors for Southwire, a leading manufacturer of wire and cable used in the transmission and distribution of electricity, delivering power to millions of people around the world. Carter is chair of the Business Leaders Committee on the State of Michigan's Black Leadership Advisory Council, a member of the Executive Leadership Council and chair of the Catalyst Board of Advisors.
>
> Carter has a bachelor's degree in marketing from Howard University and a master's degree in international business from DePaul University. She has been published in the Journal of the American Health Information Management Association and featured in Chemical Week, the Huffington Post, MORE Magazine, the Disrupt Yourself Podcast and The Future of Work Podcast. In 2018, Carter was named to Black Enterprise's Top Executives in Diversity list and received Northwood University's Distinguished Women Award. In 2019, she was named to Black Enterprise's Most Powerful Women in Corporate America list. Since 2020 Carter has been recognized as one of the 100 Ethnic Minority Executives on the EMpower Ethnic Minority Role Model Lists supported by Yahoo! Finance. Most recently, Carter was inducted into The Kansas African American Museum Trailblazer Hall of Fame.

**Defendant Tate**

25. Defendant Tate has served as the Company's CFO since November 1, 2023.

26. The Company's Leadership website, with a separate page dedicated to Defendant Tate,[2] stated the following about him:

> Jeff Tate is Chief Financial Officer for Dow, a global materials science company with 2024 sales of approximately $43 billion. In this role, Tate is a member of the company's executive committee that sets strategic direction, defines priorities, establishes corporate policy, and manages governance.

[2] https://corporate.dow.com/en-us/about-dow/leadership/jeff-tate.html.

He has executive oversight for Finance, Investor Relations, Real Estate and Corporate Facilities. Tate is a member of the Board of Directors for Huntington Bancshares Inc (NASDAQ: HBAN), including the Audit, Nominating and Corporate Governance committees. He also sits on the Board of Directors of the Detroit Economic Club, Business Leaders for Michigan, and FCLTGlobal, a nonprofit organization focused on capital for the long-term to support a sustainable and prosperous economy, where he serves on the Finance and Audit Committee. Additionally, Tate sits on the Board of Directors for Diamond Infrastructure Solutions, where he chairs the Audit Committee and is a member of the Business Development and Planning Committee.

As the former Chief Financial Officer and Executive Vice President of Leggett & Platt (NYSE: LEG), a $5 billion diversified global manufacturer, Tate led global finance across 15 business units and 135 manufacturing sites. In this role, he led the company's financial priorities with a strong emphasis on cash flow, capital allocation, and investor engagement. He also had accountability for Global Finance, Treasury, Corporate Development, FP&A, Audit, Tax, and Investor Relations. Tate first joined Dow in 1992 and held several senior-level finance, operating and general management roles, including serving as vice president of finance for Dow Packaging & Specialty Plastics. He previously served as chief audit executive, leading Dow's global internal audit and investigation activities and was also director of Investor Relations.

Tate is widely regarded for his financial acumen, strategic insight, and his standout ability to develop and grow world-class finance organizations and build a pipeline of talent. He is viewed as a culture catalyst, inspiring communicator, and strong champion and leading voice for Diversity, Equity, and Inclusion. He sits on North Carolina's A&T College of Business and Economics Executive Advisory Council and the Corporate Advisory Board for the National Association of Black Accountants, where he was recognized as the 2020 Chief Financial Officer of the year. In 2020, Tate was named by Savoy Magazine as one of its "Top 100 Most Influential Blacks in Corporate America".

Tate is a graduate of Harvard University's CFO Leadership Program, the University of Chicago Booth School of Business Executive

> Education Program for Prospective CFOs, Dartmouth College Strategic Finance Leadership Executive Education Program, and Thunderbird Executive Education Program. He holds a Bachelor of Science in Accounting from the University of Alabama and is a Certified Public Accountant.

**Defendant Allen**

27. Defendant Allen has served as a Company director since 2019. Defendant Allen currently serves as a member of the Compensation Committee, of which he has been a member since August 1, 2019, and as Chair of the Corporate Governance Committee since April 9, 2020.

28. The 2025 Proxy stated the following about Defendant Allen, in relevant part:

> Mr. Allen is the former Chairman and Chief Executive Officer of Deere & Company, a world leading provider of products and services for agriculture, construction, road-building, forestry, and turf care. He served as Chairman at Deere & Company from 2010 to 2020, Director from 2009 to 2020, and Chief Executive Officer from 2009 to 2019. Mr. Allen joined Deere in 1975 and held various executive positions until assuming the role of Chairman and Chief Executive Officer.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Mr. Allen brings global public company, business, and leadership expertise as the former Chairman and Chief Executive Officer of Deere. He has extensive experience and knowledge of international business operations, manufacturing, consumer marketing, and sales, which are particularly important given the global presence and business operations of the Company. He provides the Board valuable insight on the Company's strategic planning and enterprise risk management. Mr. Allen has public company board experience resulting in corporate governance, talent succession, and executive compensation expertise, as well as board leadership experience.

**Defendant Banister**

29. Defendant Banister has served as a Company director since 2020. Defendant Banister currently serves as a member of the Compensation Committee, of which he has been a member since August 13, 2020, and as a member of the Corporate Governance Committee, of which he has been a member since April 19, 2025.

30. The 2025 Proxy stated the following about Defendant Banister, in relevant part:

> Mr. Banister is the former President and Chief Executive Officer of Aera Energy LLC, an oil and gas exploration and production company jointly owned by Shell Oil Company and ExxonMobil; he served from 2007 to 2015. Prior to Aera Energy, Mr. Banister served in various executive leadership positions at Shell Oil, including Vice President, Upstream Asia Pacific and Vice President, Upstream Americas, overseeing drilling and development activities; Vice President, Business Development and Technology; and President USA and Executive Vice President of Shell Services EP Gas and Power. Mr. Banister joined Shell Oil in 1980 as an offshore facilities engineer. He served on the Board of Directors of the Bristow Group from 2017 to 2019, Marathon Oil from 2015 to 2018, and Tyson Foods from 2011 to February 2022. Mr. Banister also serves as Chair of the Board of Directors of Russell Reynolds Associates, a private leadership advisory and search firm.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Mr. Banister brings significant global business and leadership expertise as former Chief Executive Officer of one of California's largest oil and gas producers and through his public company board experience. He has a strong background in engineering and the energy sector and provides valuable perspective in strategic planning, public policy, climate related matters, information technology, marketing and brand

> management, enterprise risk management, and operational excellence, all of which are relevant to Dow's business operations. Mr. Banister has an established record of advocacy for people through both a safe and inclusive workplace.

**<u>Defendant Bush</u>**

31. Defendant Bush has served as a Company director since 2018. Defendant Bush has also served as a member of the Corporate Governance Committee since April 15, 2021; as a member of the Audit Committee since April 1, 2019; and as a member of the Environment, Health, Safety & Technology Committee (the "EHST Committee") since April 1, 2019.

32. The 2025 Proxy stated the following about Defendant Bush, in relevant part:

> Mr. Bush is the former Chairman and Chief Executive Officer of Northrop Grumman Corporation, a global aerospace and defense technology company. Mr. Bush served as Northrop Grumman's Chairman from 2011 to 2019, Director from 2009 to 2019, and Chief Executive Officer from 2010 to 2018. Previously, Mr. Bush served as the company's Chief Operating Officer, Chief Financial Officer, and President of its Space Technology Business. Prior to the acquisition of TRW by Northrop Grumman in 2002, Mr. Bush served as President and Chief Executive Officer for TRW's UK-based global Aeronautical Systems. He joined TRW in 1987 and held engineering positions with both the Aerospace Corporation and Comsat Labs. Mr. Bush served as Director of Norfolk Southern Corporation from 2012 to 2019. Mr. Bush was named to the DowDuPont Inc. Materials Advisory Committee in August 2018 and served until April 2019.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Mr. Bush brings significant leadership and governance experience, including as a public company Chief Executive Officer, with a strong

> background in engineering and the industrials and transportation sectors. Mr. Bush is also a proven operator as a former Chief Operating Officer and is also experienced in finance and accounting, safety, environmental and climate matters—including through his role as a board member of Conservation International—public policy, governmental and stakeholder relations, corporate citizenship, human capital, cybersecurity and information technology, risk management, and strategic planning.

**<u>Defendant Davis</u>**

33. Defendant Davis has served as a Company director since 2015. Defendant Davis has also served as a member of the Corporate Governance Committee since April 1, 2019; as a member of the Compensation and Leadership Development Committee since April 10, 2025; and as Chair of the Audit Committee since April 15, 2021, having been a member of the Audit Committee before that time since April 1, 2019.

34. The 2025 Proxy stated the following about Defendant Davis, in relevant part:

> Mr. Davis is the former Executive Chairman and Chief Executive Officer of U.S. Bancorp, parent company of U.S. Bank, one of the largest commercial banks in the United States. He served as Executive Chairman from 2007 to 2018, Chief Executive Officer from 2006 to 2017, and held various other executive positions at U.S. Bancorp including President and Chief Operating Officer. Mr. Davis was an Executive Vice President at Bank of America and Security Pacific Bank prior to joining Star Banc Corporation, which was one of U.S. Bancorp's legacy companies. Mr. Davis served as the President and Chief Executive Officer of Make-A-Wish America from January 2019 to November 2022. He served as director of Xcel Energy Inc. from 2006 to 2020. Mr. Davis served as a Director of TDCC from May 2015 until September 2017 when he became a member of the DowDuPont

> Inc. Materials Advisory Committee and then, in July 2018, a Director of DowDuPont Inc. Mr. Davis resigned from the DowDuPont Inc. Board in April 2019. Mr. Davis has served as Independent Lead Director since April 2021.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Mr. Davis brings global business and leadership experience as a former Chairman and Chief Executive Officer of a public company, particularly in industries subject to extensive regulation. He has extensive experience and knowledge of international business operations, financial services, and capital allocation, which is particularly important given the global presence and financial aspects of the Company. Mr. Davis has additional public company and nonprofit board experience across the financial services and medical industries resulting in additional corporate governance and compensation experience, financial expertise, risk management, strategic planning and board leadership experience.

**Defendant DeVard**

35. Defendant DeVard has served as a Company director since 2022. Defendant DeVard has also served as a member of the Audit Committee since April 15, 2021; and as a member of the EHST Committee since April 15, 2025.

36. The 2025 Proxy stated the following about Defendant DeVard, in relevant part:

> Ms. DeVard is the former Executive Vice President and Chief Customer Officer of Office Depot, Inc., an office supply retailing company, a role she held from 2018 to 2020. Prior to joining Office Depot in 2017 as Chief Marketing Officer, she served as Senior Vice President and Chief Marketing Officer at The ADT Corporation from 2014 to 2016 and Executive Vice President and Chief Marketing Officer at Nokia Corporation. Ms. DeVard has held senior marketing roles at Verizon Communications Inc., Citibank N.A., Revlon Inc., Harrah's Entertainment, the Minnesota Vikings, and The Pillsbury Company. Ms. DeVard was also principal at DeVard Marketing Group,

> a firm specializing in digital and multicultural branding and marketing strategies. Ms. DeVard served on the Board of Directors of the Focus Impact Acquisition Corp. from 2021 to January 2022 and ServiceMaster from 2016 to 2018.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Ms. DeVard is a senior marketing executive with over 30 years of leadership experience at large global brands, including those of public companies. She is highly experienced in the strategic, operational, and financial aspects of integrated and online marketing, including expertise in e-commerce, brand management, and customer engagement. Ms. DeVard also brings extensive risk management and governance experience in consumer products, e-commerce, social impact, change management, and digital transformation across national and global enterprises, all of which are key areas of focus for the Company. Ms. DeVard is the CEO and founder of the Black Executive CMO Alliance (BECA), an alliance designed to help build the next generation of marketing executives.

**<u>Defendant Dial</u>**

37. Defendant Dial has served as a Company director since 2021. Defendant Dial has also served as a member of the Audit Committee since April 15, 2021; and as a member of the EHST Committee since April 15, 2021.

38. The 2025 Proxy stated the following about Defendant Dial, in relevant part:

> Ms. Dial is the former Senior Vice President, Chief Accounting Officer, and Controller of AT&T Inc., a global telecommunications company. Ms. Dial served as Chief Accounting Officer from 2022 to 2023 and Senior Vice President and Controller from 2016 to 2023. Previously Ms. Dial served as Vice President of Finance for AT&T Capital Management with responsibility for capital allocation, budgeting, and governance, and as Chief Financial Officer for the AT&T Chief Information and Technology Officers. Prior to joining AT&T in 1996,

> Ms. Dial spent ten years at KPMG in their audit practice, where she held roles of increasing responsibility.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Ms. Dial is a senior finance executive with over 25 years of experience in financial reporting, accounting policy, and capital allocation with a Fortune 50 global telecommunications company. Ms. Dial brings a broad perspective and strategic insights through her experience in driving sizeable merger integration; leading successful cost transformation; executing mergers and acquisitions valuation analysis; overseeing SEC reporting including climate related disclosures, financial policy, and governance; managing long-term financial planning; focusing on enterprise risk management; and supporting investor relations, all of which are key areas of focus for the Company.

**Defendant Fettig**

39. Defendant Fettig has served as a Company director since 2003. Defendant Fettig has also served as a member of the Corporate Governance Committee since April 1, 2019; and as Chair the Compensation Committee since April 9, 2020, having joined as a member of the Audit Committee on April 1, 2019.

40. The 2025 Proxy stated the following about Defendant Fettig, in relevant part:

> Mr. Fettig is the former Chairman and Chief Executive Officer of Whirlpool Corporation, a manufacturer of home appliances. He served as Chairman from 2004 to 2018, and Chief Executive Officer from 2004 to 2017. Mr. Fettig joined Whirlpool Corporation in 1981 and held various executive positions until assuming the role of Chairman and Chief Executive Officer. Mr. Fettig served as a Director of TDCC from December 2003 until September 2017 when he became a Director of DowDuPont Inc. Mr. Fettig resigned from the DowDuPont Inc. Board in April 2019.

> CONTRIBUTING TO DOW'S BOARD
>
> Mr. Fettig brings global public company, business, and leadership experience as the former Chairman and Chief Executive Officer of Whirlpool Corporation. He has extensive experience and knowledge of corporate governance, international business operations, manufacturing, marketing and brand management, sales and distribution, which is particularly important given the global presence and business operations of the Company. Mr. Fettig also has extensive experience and knowledge of consumer dynamics, branded consumer products, and end-user markets and servicing relevant to the business operations and focus of the Company. He provides the Board valuable insight on the Company's strategic priorities and enterprise risk management.

**Defendant Hinman**

41. Defendant Hinman has served as a Company director since 2018. Defendant Hinman has also served as a member of the Corporate Governance Committee since April 15, 2021; as a member of the Compensation and Leadership Development Committee since April 14, 2022; and as Chair the EHST Committee since April 15, 2021, having joined as a member of the EHST Committee on April 1, 2019.

42. The 2025 Proxy stated the following about Defendant Hinman, in relevant part:

> Ms. Hinman is the Chief Executive Officer and a director of Atlas Technical Consultants, a private infrastructure and environmental solutions provider. She has held this position since January 2024. Ms. Hinman is the former Chairman, President, and Chief Executive Officer of CH2M HILL Companies ("CH2M"), an engineering and consulting firm focused on delivering infrastructure, energy, environmental, and industrial solutions for clients and communities around the world. Ms. Hinman joined the Board of Directors of CH2M in 2008 and was

> elected Chairman and Chief Executive Officer of CH2M in 2014 in order to execute a turnaround of the firm, ultimately leading to the company's successful merger with Jacobs Engineering in 2017. Ms. Hinman served on the Board of Directors of AECOM from 2019 until March 2022. She was named to the DowDuPont Inc. Materials Advisory Committee in July 2018 and served until April 2019.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Ms. Hinman brings senior management and leadership capabilities, having served as Chairman, President, and Chief Executive Officer of CH2M, including deep experience with global manufacturing companies. Ms. Hinman's experience in a global engineering consulting business provides her with a unique knowledge of environmental and sustainability issues globally. Ms. Hinman also brings international operations, strategic planning, risk management, finance, accounting, supply chain, information technology, marketing and brand management expertise to the Board

**<u>Defendant Liebert</u>**

43. Defendant Liebert has served as a Company director since April 2025. Defendant Libert has also served as a member of the Audit Committee since and as a member of the EHST Committee since that time.

44. The 2025 Proxy stated the following about Defendant Liebert, in relevant part:

> Ms. Liebert is the President and Chief Executive Officer of The Lubrizol Corporation, a Berkshire Hathaway company and provider of specialty chemicals for the transportation, industrial and consumer markets. She has held the position since October 2022. Previously, Ms. Liebert was an Executive Vice President at PPG Industries, Inc., a publicly traded global manufacturer of paints, coatings and specialty chemicals, from October 2019 to September 2022. Ms. Liebert joined PPG in June 2018 and served as Senior Vice President of Automotive Coatings until taking the Executive Vice President role in October

> 2019. Prior to PPG, Ms. Liebert spent a decade at Honeywell in senior roles including most recently serving as President and Chief Executive Officer of Honeywell UOP, which develops technology for the petroleum refining, gas processing, petrochemical production, and major manufacturing industries. She began her Honeywell career in the Electronic Materials business and moved to UOP in 2012. Earlier, she spent two years at Alcoa as President of Reynolds Food Packaging and started her career at Nova Chemicals. In February 2022, Ms. Liebert was elected to the National Academy of Engineering, one of the engineering profession's most prestigious distinctions.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Ms. Liebert brings more than two decades of experience leading global organizations in the chemicals sector, with deep industry expertise and a proven track record of driving large-scale operational excellence. Throughout her career, Ms. Liebert has successfully spearheaded initiatives to advance sustainable, science-based innovations to service customers. Ms. Liebert brings extensive experience in international operations, strategic planning, risk management, finance and accounting, supply chain, safety, information technology, digital transformation, marketing and brand management, and corporate citizenship to the Board. She is a strong industry advocate, serving on the Board of the American Chemistry Council and as an elected member of the National Academy of Engineering.

**<u>Defendant Moreno</u>**

45. Defendant Moreno has served as a Company director since 2021. Defendant Moreno has also served as a member of the Compensation and Leadership Development Committee since April 15, 2021; and as a member of the EHST Committee since April 15, 2021.

46. The 2025 Proxy stated the following about Defendant Moreno, in relevant part:

> Mr. Moreno is the Managing Director at Allen & Co LLC, a private investment bank. He has held the position since 2021. Mr. Moreno is the former President of Inter-American Development Bank Group ("IDB"), a regional multilateral financing development bank for economic, social, and institutional development in Latin America and the Caribbean, having served from 2005 to 2020. Before joining IDB, Mr. Moreno served as Colombia's Ambassador to the United States from 1998 until 2005, leading bipartisan and bilateral assistance programs including Plan Colombia, a program to fight drug trafficking and promote social and economic recovery. Mr. Moreno previously served as Colombia's minister of economic development and as head of the Industrial Advancement Institute, a public-sector holding company. Mr. Moreno served on the Board of Fomento Económico Mexicano, S.A.B. de C.V., Coca-Cola FEMSA from 2021 to 2022.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Mr. Moreno is highly qualified in the areas of development finance; public policy; and social, economic, and institutional development. Mr. Moreno has an established record for advocacy for social objectives and leads numerous initiatives to benefit the global community such as advances in renewable energy and the protection of the environment, healthcare access, climate resilience and adaptation, sustainable cities, and digital connectivity and innovation. He has experience in both public and private sectors in Colombia and significant expertise in capital planning, financing and risk management.

**Defendant Wyant**

47. Defendant Wyant has served as a Company director since 2020. Defendant Wyant has also served as a member of the Compensation and leadership Development Committee since April 9, 2020; and as a member of the EHST Committee since April 9, 2020.

48. The 2025 Proxy stated the following about Defendant Wyant, in relevant part:

> Ms. Wyant is the President and Chief Executive Officer of Madison Air, an enterprise dedicated to creating a safer, healthier, and more productive world by helping customers realize the transformational power better air has on business. Prior to joining Madison Air in 2021, Ms. Wyant was the Executive Vice President of Innovation and Transformation of Ecolab Inc., a global leader in water, hygiene, and energy technologies and services, a role she held from 2020 to 2021. Other leadership roles held at Ecolab include Executive Vice President and President of Global Regions, Executive Vice President and President of the Global Food & Beverage, Global Healthcare and Global Life Sciences businesses, Senior Vice President and General Manager of Food & Beverage in North America and Latin America, and leading Food & Beverage in Asia Pacific. Before joining Ecolab in 2009, Ms. Wyant held multiple leadership positions at General Electric.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Ms. Wyant is a senior strategy and operating executive with over 25 years of experience leading Fortune 500 businesses in the industrial and healthcare sectors. Ms. Wyant's career reflects a track record of driving innovative strategies to capture new growth and profit, spearheading breakthrough innovation, driving manufacturing excellence and operational efficiency, leading transformational mergers and acquisitions, and managing risk. She also brings deep industry knowledge, broad perspective on international business and global expansion, experience driving enterprise-wide digital transformations, and sustainability expertise.

**<u>Defendant Yohannes</u>**

49. Defendant Yohannes has served as a Company director since 2018. Defendant Yohannes has also served as a member of the Corporate Governance Committee since April 10, 2025; and as a member of the Audit Committee since April 1, 2019.

50. The 2025 Proxy stated the following about Defendant Yohannes, in

relevant part:

> Mr. Yohannes served as the U.S. Ambassador to the Organisation for Economic Co-operation and Development (the "OECD"), an international forum promoting economic growth, sustainable development, and energy security, from 2014 to 2017. Prior to joining OECD, Mr. Yohannes served as Chief Executive Officer of Millennium Challenge Corporation, the independent U.S. government foreign aid agency for poverty. Prior to his U.S. government service, Mr. Yohannes was a leader in the financial services industry, working in various roles including Vice Chairman and member of the management committee of U.S. Bank, President and Chief Executive Officer of Colorado National Bank, and Executive Vice President of Security Pacific Bank (now Bank of America). Mr. Yohannes was named to the DowDuPont Inc. Materials Advisory Committee in July 2018 and served until April 2019.
>
> CONTRIBUTING TO DOW'S BOARD
>
> Mr. Yohannes has a successful record of operation execution and corporate transformation as a Chief Executive Officer and an entrepreneur. He provides the Board finance, governance and risk management expertise and valuable strategic insight into public policy, international trade, and economic development from prior affiliations. Additionally, Mr. Yohannes is passionate about protecting the environment and provides experience in effectively addressing environmental and social issues.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51. By reason of their positions as officers, directors, and/or fiduciaries of Dow and because of their ability to control the business and corporate affairs of Dow, the Individual Defendants owed Dow and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dow in a fair, just, honest, and

equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dow and its shareholders so as to benefit all shareholders equally.

52. Each director and officer of the Company owes to Dow and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dow, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54. To discharge their duties, the officers and directors of Dow were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Dow, the absence of good faith on their part, or a reckless

disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Dow's Board at all relevant times.

56. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57. To discharge their duties, the officers and directors of Dow were required to exercise reasonable and prudent supervision over the management,

policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Dow were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Michigan, and the United States, and pursuant to Dow's own Code of Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Dow conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Dow and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Dow's operations would

comply with all applicable laws and Dow's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58. Each of the Individual Defendants further owed to Dow and the shareholders the duty of loyalty requiring that each favor Dow's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

59. At all times relevant hereto, the Individual Defendants were the agents of each other and of Dow and were at all times acting within the course and scope of such agency.

60. Because of their advisory, executive, managerial, directorial, and controlling positions with Dow, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

61. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Dow.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future

business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

64. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Dow was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Dow, and was at all times

acting within the course and scope of such agency.

## DOW'S CODE OF CONDUCT

67. The Company's Code of Conduct opens with an introductory note from Defendant Fitterling, each of Dow's employees has "the duty to perform [their] jobs in an open, honest and ethical manner even when it is not to [the Company's advantage." Accordingly, in the first section of the Code of Conduct, titled "Scope and general principles," states that the Code of Conduct applies to "all directors, officers, and full- and part-time employees of Dow Inc., including all subsidiaries, as well as joint ventures that adopt the Code." This section further states that employees "have an obligation to behave in a way that protects [Dow's] business interests, [its] reputation, and each other," including "taking action to promptly report any conduct inconsistent with the Code, [Dow's] values or the law."

68. Under the section entitled "Ethics standards," the Code of Conduct contains a subsection titled "Business and financial records" which states:

> Business and financial records are essential to Dow's success. The integrity and accuracy of these records help internal decision-making and are the basis of our reporting to shareholders, investors, creditors, government agencies and other stakeholders. We must:
>
> - Keep and present all Company records and reports in accordance with the law, our internal control policies, and generally accepted accounting principles. These records include accounting records as well as any other electronic or written records, such as expense reports, time sheets, medical claim forms, personnel records and reviews, and the wide variety of analytical, engineering and technical reports generated by the Company.

- Establish and maintain a system of strong and effective internal controls.
- Ensure that all Company records accurately and fairly reflect the underlying transaction.
- Never falsify any document.
- Record all financial transactions in the proper account, department and accounting period.
- Ensure that all actions and commitments are in accordance with Dow's Authorization Policy and Delegation of Authority.
- Validate that all public communications, including reports to government authorities, are full, fair, accurate, timely and understandable.
- Raise any concerns and report any suspect misconduct related to the accuracy of Dow records with finance management or through another appropriate channel, such as the Dow EthicsLine.

69. In the same section, under the subheading "Communications with the public," the Code of Conduct states:

> We strive to communicate with the public in an accurate and consistent way. To be sure that we comply with the law and protect our interests, only those who are specifically designated to do so should represent the Company to the public or media.
>
> If we receive an inquiry from an outside contact about a Company matter, we should direct the inquiry to our local Public Affairs representative.

70. In the section "Administration of the Code," the Code of Conduct states as follows:

> We are committed to maintaining an environment where compliance with the law and this Code is expected. This expectation begins with each employee and extends to our customers, suppliers, business partners, shareholders and regulators.

> The Office of Ethics and Compliance is responsible for Code administration, with oversight by the General Counsel and the Audit and Governance Committees of the Board of Directors.

71. In the same section, under the subheading "Investigation and response," the Code of Conduct states:

> A violation of the Code is unacceptable, and anyone who violates the Code is subject to disciplinary measures in conformance with applicable laws, up to and including termination of employment.
>
> The Company takes seriously and fully investigates all known potential legal or Code violations. Relevant subject matter experts assigned by the Office of Ethics and Compliance conduct the investigations. Investigations are conducted in a way that is respectful, confidential and fair. If the investigation substantiates an allegation, an appropriate management team will review the findings and determine the final outcome.
>
> The Company will protect anyone who raises a concern in good faith. It is a violation of the Code to knowingly make a false accusation, lie to an investigator, interfere with or refuse to cooperate in an investigation. Everyone who is part of Dow's workforce is expected to be truthful and fully cooperate in any investigation.

72. In the same section, under the subheading "Waiver," the Code of Conduct states:

> The Board of Directors or its designated committee must approve any waiver of a provision of the Code, and the Company will disclose publicly on the Company's website any waiver of or amendment to the Code requiring disclosure under applicable law, rule or regulation.

73. In violation of the Code of Conduct, the Individual Defendants (as key officers and/or as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and

disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## DOW'S AUDIT COMMITTEE CHARTER

74. Dow's Audit Committee Charter (the "Audit Committee Charter") states in its first section, titled "Purpose," that:

> The primary purpose of the Audit Committee (the "Committee") is to assist the Dow Inc. (the "Company") Board of Directors (the "Board") in fulfilling its oversight responsibilities as set forth below and relating to:
>
> - the quality, reliability and integrity of the financial statements of the Company;
> - the quality, reliability and integrity of environmental, social and governance reporting by the Company;
> - the adequacy of the Company's internal controls particularly with respect to the Company's compliance with legal and regulatory requirements and corporate policy;
> - the Company's internal audit function;
> - the nomination of the independent auditor and the independent auditor's qualifications, independence and performance; and
> - the application of the Company's accounting principles.

75. Under the section entitled "Responsibilities," Dow's Audit Committee Charter states that:

> The Committee's duties and responsibilities shall be to:
>
> - Regularly report to the Board. In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent registered public accounting firm, or the performance of the internal audit function.
>
> - Conduct such additional activities and consider such other matters, within the scope of its responsibilities, as the Committee or the Board deems necessary or appropriate.

76. In the same section, under the subheading "Independent Registered Public Accounting Firm," the Audit Committee Charter states that the Audit Committee's responsibilities include:

> - Nominate, engage and replace, as appropriate, the independent registered public accounting firm to audit the consolidated financial statements of the Company and submit such independent registered public accounting firm for stockholder ratification.
>
> - Pre-approve all audit and permitted non-audit related services (including services to any of the Company's consolidated subsidiaries), including the fees related to the provision of such services, to be performed by the Company's independent registered public accounting firm. The Committee may also authorize preapproval policies and procedures that involve the establishment of pre-approval categories. The Committee shall be informed of each service performed and amounts incurred within each pre-approval category as presented by the

independent auditor and reviewed by the Committee at each Audit Committee meeting.

- Oversee, review and evaluate the audit efforts of the Company's independent registered public accounting firm, including evaluation of the lead partner.

- Ensure the submission to the Committee by the independent registered public accounting firm, at least annually (and, with respect to (3) below, prior to its initial engagement) of a report describing (1) the independent registered public accounting firm's quality control procedures, (2) any material issues raised by the independent registered public accounting firm's most recent internal quality control review or peer review or by any governmental or professional inquiry or investigation in the most recent five-year period relating to the independent registered public accounting firm's audits and steps taken to address such issues, and (3) a report describing all relationships between the independent registered public accounting firm and the Company that may reasonably be thought to bear on independence (including a description of each category of services provided by the independent registered public accounting firm to the Company and a list of fees billed for each such category).

- Evaluate the independence of the Company's independent registered public accounting firm by, among other things, (1) monitoring compliance by the Company's independent registered public accounting firm with the audit partner rotation requirements contained in the Securities Exchange Act of 1934 (the "Exchange Act") and the rules and regulations promulgated by the U. S. Securities and Exchange Commission (the "SEC") thereunder, (2) monitoring compliance by the Company with the employee conflict of interest requirements contained in the Exchange Act and the rules and regulations promulgated by the SEC thereunder, and (3) engaging in a dialogue with the independent registered public accounting firm to confirm that audit partner compensation is consistent with applicable SEC rules.

- Actively engage in dialogue with the independent registered public accounting firm with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent registered public accounting firm.

- As appropriate, recommend to the Board to take appropriate action in response to the independent registered public accounting firm's report to satisfy itself of its independence.

- Present to the Board conclusions with respect to the preceding matters, as well as a review of the lead partner of the independent registered public accounting firm and its views on whether there should be a regular rotation of the independent public accounting firm.

- Establish a policy to govern the Company's hiring of employees or former employees of its independent registered public accounting firm.

- Review and discuss with the independent registered public accounting firm about its annual audit plan, including the timing and scope of audit activities, and monitoring such plan's progress and results during the year.

- Review and approve in advance of any services provided by the independent registered public accounting firm to the Company's executive officers or members or their immediate family.

77. In the same section, under the subheading "Financial Reporting and Disclosure," the Audit Committee Charter states that with respect to such tasks, the Audit Committee's responsibilities encompass:

- Review with management and the independent registered public accounting firm of the Company's financial statements, disclosures and Management's Discussion and Analysis of Financial Condition and Results of Operations, and critical audit

matters disclosed in the auditor's report to be included in the Company's Annual Report on Form 10-K and in its quarterly reports on Form 10-Q prior to filing such reports with the SEC. Such review shall include a discussion with the independent registered public accounting firm regarding those matters required to be discussed under generally accepted auditing standards and applicable regulations.

- Discuss with the independent registered public accounting firm, and resolve, any problems or difficulties encountered during the course of the audit, management's response and any significant disagreements with management.

- Review and discuss with management the type and presentation of information to be included in the Company's press releases announcing financial results and, if applicable, guidance on financial results (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), and the Company shall provide to the Committee in advance each such press release or other communication in which the Company may provide guidance on financial results and other financial information so the Committee may review and discuss with management (though the Committee need not discuss in advance each such press release or each instance in which the Company may provide guidance on financial results).

- Review with management (including the corporate auditor) and the independent registered public accounting firm (1) major issues regarding accounting principles and financial statements presentations, including any significant changes in the Company's selection or application of accounting principles or accounting conventions; (2) any analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles methods on the Company's financial statements; and (3) the effect of

regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

78. In the same section, under the subheading "Internal Audit," the Audit Committee Charter tasks the Audit Committee as follows:

- Approve the appointment, removal and annual compensation of the corporate auditor.

- Review the internal audit charter, annual plan and scope of work and significant internal control findings.

- In collaboration with management, review and appraise the audit efforts of the Company's internal audit function, including the responsibilities, budget and staffing of the internal audit function.

79. In the same section, under the subheading "Compliance and Risk Processes," the Audit Committee Charter states as follows:

- Review with management of the Company's administrative, operational and accounting internal controls, including any special audit steps adopted in light of the discovery of material control deficiencies and, in conjunction with the Corporate Governance Committee, the internal control framework and centralized processes related to the Company's environmental, social and governance reporting.

- Receive periodic reports from the independent registered public accounting firm, management and the internal audit function to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company.

- Communicate openly among and individually with the independent registered public accounting firm, management, the internal audit function, and the Board, and taking appropriate actions resulting from this interaction.

- Establish procedures for the receipt, retention and resolution of complaints regarding accounting, internal controls or auditing matters, including procedures for the confidential, anonymous submission of complaints by employees of the Company.

- Meet periodically with management to discuss current and, if any, proposed, guidelines and policies governing the processes used to assess, monitor and control the Company's major risk exposures, including climate-related or financial risk exposures, as well as, if any, actual major risk exposures.

- Meet periodically with the general counsel to review legal and regulatory matters, including (1) any matters that may have a material impact on the financial statements of the Company, and (2) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breach of fiduciary duty to the Company.

- Meet at least annually with senior management to review and approve the Company's global tax strategy and policy.

- Oversee the Company's cybersecurity and information security framework and risk management; meet at least annually with senior management to review and discuss the Company's cybersecurity program and information security policies and procedures including key risk areas and mitigation strategies; review periodic reports on any notable cyber threats or incidents.

- Review the effectiveness of the Company's systems, procedures and programs designed to promote and monitor compliance with applicable laws and regulations and receiving prompt reports from the general counsel, corporate auditor and/or the senior compliance person(s), as appropriate, on any compliance matter that could adversely impact the quality, reliability or integrity of the Company's external financial process or adequacy of the Company's internal controls.

- Oversee the Company's compliance programs, including code of business conduct and code of financial ethics, and, at least annually, meet to review the implementation and effectiveness of the Company's ethics and compliance programs with the Company's general counsel, who shall have the authority to communicate promptly and directly to the Committee about any matters involving criminal or potential criminal conduct.

- Review the Company's policies relating to the ethical handling of conflicts of interest and reviewing past or proposed transactions between the Company and members of management as well as policies and procedures with respect to officers' expense accounts and perquisites, including the use of corporate assets. The Committee shall consider the results of any review of these policies and procedures by the independent registered public accounting firm.

- In conjunction with the Corporate Governance Committee, review and recommend to the Board for approval any changes to the Company's code of business conduct and code of financial ethics (and any waivers as may be granted in accordance with such codes).

- The Committee shall prepare the report required by the rules of the SEC to be included in the Company's annual meeting proxy statement.

80. In the section "Authority, Outside Consultants and Funding," the Audit Committee Charter states the following:

> In discharging its role, the Committee is empowered to inquire into any matter that it considers necessary or appropriate to carry out its responsibilities, with access to all books, records, facilities and personnel of the Company, and, subject to the direction of the Board, the Committee is authorized and delegated the authority to act on behalf of the Board with respect to any matter it determines to be necessary or appropriate to the accomplishment of its purposes.

> The Committee shall have the authority to retain legal, accounting or other consultants as the Committee may deem appropriate in its sole discretion.
>
> The Committee shall have the sole authority to approve related fees and retention terms. The Company shall provide the Committee with the appropriate funding, as determined by the Committee in its capacity as a committee of the Board, for payment of compensation to its legal, accounting and any other consultants and for the Committee to carry out its responsibilities.

81. In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

82. Dow is purportedly "one of the world's leading materials science companies." Dow conducts its business activities through six global business organized into three segments: (1) Packaging & Specialty Plastics; (2) Industrial Intermediates & Infrastructure; and (3) Performance Materials & Coatings.

83. Packaging & Specialty Plastics consists of two businesses: Hydrocarbons & Energy, which is "a leading global producer of ethylene," and a producer of propylene and aromatics, and which also "produces and procures the

power, steam and feedstocks used by the Company's manufacturing sites;" and Specialty Plastics, which is a major producer of polyethylene and other ethylene derivatives for use by consumer, wire and cable, and construction markets.

84. Industrial Intermediates & Infrastructure consists of two businesses: Industrial Solutions and Polyurethanes & Construction Chemicals. Industrial Solutions produces products for enabling and improving the manufacture of consumer and industrial goods and services, primarily producing and marketing ethylene oxide and propylene oxide derivatives for everything from coatings to electronic to oil and gas applications.

85. Polyurethanes & Construction Chemicals consists itself of three sub-businesses: Polyurethanes, Chlor-Alkali & Vinyl, and Construction Chemicals. Polyurethanes produces propylene oxide, propylene glycol, and polyether polyols, in addition to aromatic isocyanates and polyurethane systems, *inter alia*, for applications in furniture, bedding, refrigerated transport, building insulation and aircraft deicing. Chlor-Alkali & Vinyl provides Dow with chlorine and caustic soda, and markets caustic soda, with its business assets located primarily in western Europe and Latin America, producing largely for internal use. Construction Chemicals manufactures cellulose ethers, dispersible latex powders, and acrylic emulsions for building and construction material applications.

86. Performance Materials & Coatings produces products for consumer,

infrastructure, and mobility applications. It consists of two businesses: Coatings & Performance Monomers, and Consumer Solutions. These businesses "primarily utilize the Company's acrylics-, cellulosics- and silicone-based technology platforms" to service the production of architectural and industrial coatings, as well as home and personal care, consumer and electronics, mobility, and industrial and infrastructure applications.

87. Coatings and Performance Monomers consists of two sub-businesses: Coating Materials and Performance Monomers. Coating Materials develops additives for paints and coatings. Performance Monomers manufactures acrylics-based ingredients for the production of various coatings, textiles, adhesives, and home and personal care products.

88. Consumer Solutions, likewise, is divided into two sub-businesses: (1) Performance Silicones & Specialty Materials; and (2) Silicone Feedstocks & Intermediates. These businesses work to produce silicon metal and siloxanes and related intermediates for use in the manufacture of downstream silicone products generally.

**<u>False and Misleading Statements</u>**

***January 30, 2025 Press Release***

89. On January 30, 2025, Dow issued a press release prior to the opening of the market, in which it announced its financial results for the fourth quarter of

2024 (the "Q4 2024 Press Release"). The Q4 2024 Press Release quoted Defendant Fitterling as stating, in relevant part:

> ***Despite persistently weak macroeconomic conditions, Team Dow delivered our fifth consecutive quarter of [Y/Y] volume growth, leveraging our cost-advantaged footprint to capture resilient demand for high-value applications.*** In December, we signed a definitive agreement for the sale of a minority stake in select U.S. Gulf Coast infrastructure assets for expected cash proceeds of up to approximately $3 billion. The partnership represents a new business model ***designed to drive operational efficiencies and growth with new customers, while providing near-term financial flexibility.*** We also announced a strategic review of select European assets, and today we are announcing additional actions to deliver $1 billion of targeted cost reductions. ***These collective actions represent a continuation of Dow's commitment to maintaining our strong financial foundation*** and supplementing near-term cash flow.[3]

90. The Q4 2024 Press Release also addressed the Company's outlook for 2025, quoting, for that purpose, Defendant Fitterling, in relevant part:

> ***We remain confident that Dow will benefit from the completion of our near-term incremental growth projects and an enhanced focus on operational discipline in 2025. In addition, we are optimistic that we will see further demand growth in attractive end markets such as packaging, energy and electronics . . . . Our differentiated portfolio and strong balance sheet enable us to deliver on all our capital allocation priorities, including an industry-leading dividend.*** Until we see more definitive indications of a true recovery taking hold – and in order to deliver improved margins – we are taking actions to reduce our costs by $1 billion as well as our 2025 CapEx [capital expenditure] plans by $300 - 500 million. We will complete these actions while staying the course on our long-term strategic priorities. Our proactive interventions are necessary for Dow to continue to successfully navigate this economic downcycle.

[3] All emphasis herein is added unless stated otherwise.

***January 30, 2025 Conference Call***

91. On the same day, on January 30, 2025, the Company held an earnings call with investors and analysts to discuss Dow's financial results for the fourth quarter of 2024. During the call, Defendant Fitterling continued to represent that Dow had the ability to deliver year-over-year "volume growth despite continued weak macroeconomic conditions" and thus could ultimately "foster a sustainable future, achieve long-term profitable growth, and enhance shareholder returns."

92. Defendant Fitterling simultaneously continued to boast of Dow's purported "near-term growth investments" that ostensibly would "enable improved underlying earnings and margins across the cycle." Per Defendant Fitterling, this leveraged the Company's "differentiated portfolio and proactive actions to support [its] solid financial foundation," which was the basis of his and his colleagues' "confiden[ce] in [the Company's] ability to deliver on all of [its] capital allocation priorities, including [its] industry-leading dividend."

93. During his prepared remarks, Defendant Tate also worked to downplay concerns with demand and sales across Dow's various markets, notwithstanding tariff-related headwinds and a broader relative decay of macroeconomic conditions. Saliently, with respect to Dow's Packaging & Specialty Plastics segment, Defendant Tate acknowledged that in "China, manufacturing activity remains tepid and overall demand in Europe continues to be soft," but that "in packaging, we continue to see

demand growth, especially in North American with resilient domestic and export polyethylene demand throughout the year."

94. Defendant Tate also took the opportunity to attempt to reassure investors that "planned maintenance activity scheduled at [the Company's] ethylene oxide asset in . . . Texas . . . [would] enable the start-up of additional alkoxylation capacity in the US Gulf Coast." Defendant Tate represented that this "new capacity" was one of several aforementioned "near-term growth investments" that supposedly would "support higher sales beginning in the second quarter" of 2025.

95. With respect to Dow's Performance Materials & Coating segment, Defendant Tate stated that the Company "expect[ed] the seasonal demand uptick in [the] first quarter [of 2025] to provide a tailwind of approximately $75 million," despite "soft[ness]" in "building and construction end-markets," as well as "high mortgage rates in the US and sector weakness in China."

96. On the same call, and in response to an analyst question regarding whether "if demand is unfortunately similar in 2025 versus 2024 . . . directionally, should EBITDA be up, down, [or] flat," Defendant Fitterling replied, in relevant part:

> On 2025 versus 2024, obviously, a big part of the $1 billion of cost actions we're taking are to underpin improved EBITDA in 2025. So ***we've got volume growth and I mentioned the projects that we'll have starting out this year, which all of them will be able to be sold-out and be accretive from the point that they start-up. So you'll have that.*** We're obviously not counting on a tremendous amount, ***although***

> ***we've shown five consecutive quarters of volume growth. So we're still going to keep taking advantage of our low-cost position and get our share.*** But I think pricing power is the real question and that's the reason for the cost action is to underpin the improvement in EBITDA.
>
> I would say you also have to think about the markets and a lot will depend on demand in the markets. In PNSP [Packaging & Specialty Plastics], well, I'd say in the ethylene chain, in general, ***PNSP and ethylene oxide derivatives have continued to be strong. You see that strength in Industrial Solutions. You see that strength.*** Although we had some pricing slip in the fourth quarter. ***Overall, we see that strength in the integrated margins of PNSP. So I think that will continue to be a positive sign.*** I think we'll continue to take the actions that we need to take in Europe to tighten things up there.
>
> * * *
>
> And then, of course, cash, we're going to manage very carefully, which is why you saw the CapEx reductions that we announced to try to stay in a better cash-flow position and ***keeping our dividend strong is on of the number one priorities.***

97. Furthermore, in response to another analyst question regarding "the risk and potential mitigation activities you could do around tariffs, especially around Canada," Defendant Fitterling asserted that Dow had good visibility into tariff-related impacts, while simultaneously downplaying those same impacts, stating, in relevant part:

> I think the most important thing is what we're doing right now, which is engage with the administration on providing data for ourselves and also for the industry to understand the situation. ***And we're starting to see every day like more refinement on what's happening.*** I think it's pretty clear in the near-term of the discussion is around getting control over immigration and the flow of fentanyl into United States.

***February 4, 2025 Form 10-K***

98. On February 4, 2025, the Company filed on Form 10-K with the SEC its annual report of financial and operating results for 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Fitterling, Tate, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Fitterling and Tate attesting that the 2024 10-K did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and that "the financial statements, and other financial information included in this report, fairly represent in all material respects the financial condition, results of operation and cash flows of [Dow] as of, and for, the periods presented in this report."

99. The 2024 10-K contained statements that were substantively the same as those made by Defendant Fitterling in ¶ 90, *supra*, regarding Dow's 2025 outlook.

100. Regarding Dow's outlook for its Packaging & Specialty Plastics segment in 2025, the 2024 10-K stated, in relevant part:

> In Packaging & Specialty Plastics, ***supply improvements driven by new polyethylene capacity coming online during 2025, combined with improved reliability, will allow the Company to continue to drive volume growth and improve margins***. Local prices are expected to be impacted by market supply and demand dynamics as well as volatility in feedstocks due to sensitivity to external economic and geopolitical

> factors. ***The Company's feedstock flexibility and advantaged regional footprint will continue to position the segment well to navigate market dynamics throughout the year. In-region presence and superior derivative flexibility will allow the segment to continue to optimize price and volume mix.***

101. Likewise, regarding Dow's outlook for its Industrial Intermediates & Infrastructure segment in 2025, the 2024 10-K stated, in relevant part:

> In Industrial Intermediates & Infrastructure, ***improved demand is expected based on improving fiscal conditions*** resulting from interest rate cuts across several regions. ***The Company will benefit from the full-year impact of resumed production at the Louisiana Operations Glycol-2 unit in Plaquemine, Louisiana***, which successfully restarted in June 2024. ***Recent and in-flight growth investments in specialty amines and alkoxylation capacity are expected to support long-term, above GDP volume growth in key markets*** including energy transition, pharmaceuticals and consumer health, and sustainable surfactants.

102. Similarly, regarding Dow's outlook for its Performance Materials & Coatings segment, the 2024 10-K stated, in relevant part:

> In Performance Materials & Coatings, the Company will continue to prioritize key end-markets in performance silicones in which its ***innovation and footprint can drive value and volume growth above GDP. Pricing for specialty products is expected to remain relatively stable, with anticipated modest but steady economic expansion. Volume growth is expected in feedstocks and intermediates on improved regional supply and demand dynamics***, and while competitive pressures in the market impacting local price persist, ***lower interest rates are expected to drive improved demand and local price. Market conditions impacting sales of coatings are expected to improve compared with recent years*** based on lower interest rates and an increase in residential spending.

***February 28, 2025 Proxy Statement***

103. On February 28, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial,

Fettig, Hinman, Moreno, Wyant and Yohannes solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

104. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes, as well as elect Defendant Liebert to the Board; (2) approve on an advisory basis the compensation of Dow's named executive officers; and (3) ratify the appointment of Deloitte & Touche LLP ("Deloitte") as the Company's independent registered public accounting firm for 2025.

105. Regarding the "Board's Role in the Oversight of Strategy and Priorities," the 2025 Proxy States, in relevant part:

> The Board is responsible for overseeing the Company's strategy development and planning process including an annual review of the corporate and business plans. The Board is also responsible for overseeing the environmental, social and governance priorities of the Company, including its strategy to Decarbonize & Grow, ensuring transparency, accountability and long-term stockholder value creation. Each Committee is responsible for oversight of specific strategic and environmental, social and governance areas relevant to their respective Charters. Throughout the year and at every Board meeting, the Board receives information and updates from management and actively engages with senior leaders with respect to management's execution of the corporate and business plans as well as progress on Ambition priorities. The Board and management review the Company's short- and long-term strategic priorities throughout the year and dedicate time at each Board meeting for appropriate discussion.

* * *

> Although each Committee is responsible for overseeing the management of certain responsibilities as described above, the full Board is updated throughout the year and at Board meetings by the Committees, management and senior leaders. Information made available to the Committees is also made available to the full Board. This enables the Board and the Committees to coordinate oversight and the relationships among the various priorities of the Company.

106. Under the heading "Board's Role in the Oversight of Risk Management," the 2025 Proxy Statement states:

> The Board is responsible for overseeing overall risk management for the Company, including review and approval of the enterprise risk management approach and process implemented by management to identify, assess, manage and mitigate risk, at least annually. Each Committee is responsible for oversight of specific risk areas relevant to their respective Charters. Risk management is considered a strategic priority within the Company, and responsibility for managing risk rests with management while the Committees and the Board as a whole provide oversight. The Company has processes in place to identify, assess and monitor risks, which are part of the company's overall risk management process and have been embedded in the Company's operating procedures, internal controls and information systems.

107. Under the same heading, under the subheading "Enterprise Risk Management Approach and Process," the 2025 Proxy Statement states the following:

> The enterprise risk management approach and process is conducted by Dow's strategic planning and business analysis function. This function is structurally independent of business lines. This function is led by the Senior Vice President of Corporate Development, who is responsible for risk management identification, assessment, and monitoring of risk management performance on an operational level. This role reports to the CEO. The enterprise risk management approach and process identifies, assesses, manages and mitigates risks. Risks are assessed on

> an annual basis using a broad range of inputs, both internal and external to Dow, including, but not limited to, strategic alignment; interrelation of risks; macroeconomic, industry, sustainability, geopolitical and regulatory trends; operations and safety; financial performance, including investor and rating agency perspectives; regulatory and compliance actions; market dynamics; and top risks highlighted by sources such as the World Economic Forum, The Conference Board, and industry consultants. Risks are then reviewed and categorized based on prioritization and risk tolerance, considering the potential impact and likelihood of a significant event occurring within the next five years. The results are reviewed by a varied, cross-functional leadership team representing each of Dow's businesses, functions and geographic regions. Each risk is assigned to a member of the leadership team and, if needed, internal subject matter experts accountable for a mitigation plan. Key risks that have specified mitigation actions are reviewed more regularly in leadership team meetings. Key risks, including short and intermediate term risks, and emerging risks are also regularly evaluated at meetings of the Committees and Board, including risks with economic, environmental and social impacts. In addition, the Board believes that having an Independent Lead Director enhances the Board's independent oversight of the Company's risk mitigation efforts by enabling consultation between the Chair and Independent Lead Director on time-sensitive or urgent risks. Principal risks which may negatively impact the future results of the Company are reviewed at least quarterly and a detailed discussion is included in the section titled "Risk Factors" in the Company's Annual Report on Form 10-K and subsequent Quarterly Reports on Form 10-Q.
>
> Risks may also be reassessed from time to time based on factors such as changes in the external and macroeconomic environment, concerns identified by management or the Board, or through detection in Dow's internal work processes.

108. Regarding the Code of Conduct, the 2025 Proxy Statement states the following:

> The Board adopted a Code of Conduct (the "Code"), which guides workforce behavior and sets expectations for ethical conduct on matters ranging from health and safety in the workplace, to conflicts of interest,

bribery, corruption, sustainability and citizenship. The Board also adopted a Code of Financial Ethics applicable to the principal executive officer, principal financial officer, principal accounting officer and controller. The full text of these codes, as well as our position on human rights, respect and responsibility, anti-bribery and anti-corruption, responsible sourcing and political engagement are available on the Company's website at https://corporate.dow.com/en-us/about/legal/conduct.html. In addition, Dow will disclose on its website any waiver of or amendment to the Code requiring disclosure under applicable rules.

The Dow Office of Ethics and Compliance (the "OEC"), led by the Company's Chief Compliance Officer who reports to the Company's General Counsel, is responsible for administration of the Code and the Company's ethics and compliance programs, with oversight by the Audit Committee and the Corporate Governance Committee.

The Code applies to all Directors, officers, and full and part-time employees of Dow, and its wholly-owned subsidiaries, as well as joint ventures that adopt the Code. All employees and officers are required to complete training annually to assure they understand how the Code applies to their jobs, where to obtain guidance for questions and concerns and how to report violations. All Directors, officers and employees must certify each year that they will comply with the Code.

The Code is regularly reviewed by the OEC. The Audit Committee and Corporate Governance Committee also regularly review the Code as well as the Code of Financial Ethics and recommend changes, as needed, for approval by the Board (and any waivers as may be granted in accordance with such codes).

Dow also has a Code of Business Conduct for Suppliers, through which we engage suppliers (including independent contractors and suppliers providing contract labor) globally and communicate our mandatory requirements and expectations that all suppliers are compliant with applicable regulations and Dow's values. We also regularly review and refresh the Code of Business Conduct for Suppliers, including by analyzing our current standards and industry best practices to ensure that we're holding our suppliers to the highest standards regarding ethics, sustainability, human rights, and environmental health and

> safety. The requirements of the Code of Business Conduct for Suppliers are built into all new and existing supplier contracts, to ensure they are contractually enforceable. Dow reserves the right to audit supplier compliance at any time. In the case where we identify less-than-adequate supplier practices, we reserve the right to discontinue business with the supplier or take other remedial actions. More information about Dow's mandatory requirements and expectations for suppliers and a copy of the Code of Business Conduct for Suppliers can be found at https://corporate.dow.com/en-us/about/suppliers/info/expectations.
>
> The OEC maintains the Dow EthicsLine, a confidential help line and website for those who wish to ask questions about Dow policy, seek guidance on specific situations, report in good-faith violations of the Code, its policies, the Code of Business Conduct for Suppliers, or other unethical business practices. The Dow EthicsLine is a safe, reliable and convenient method to report ethical concerns, and allows anonymous reports when legally permissible. It is available globally, with multilingual capabilities, 24 hours a day, seven days a week. Dow welcomes and encourages people to speak up and raise concerns about improper conduct. Retaliatory treatment of any kind is strictly prohibited and will not be tolerated against whistleblowers who report a potential violation in good faith. More information about the Dow EthicsLine can be found at www.dowethicsline.com.
>
> Throughout the year and at least annually, the Board receives information and updates from management and actively engages with senior leaders with respect to the effectiveness of the Company's ethics and compliance programs. In addition, the Audit Committee receives periodic reports summarizing questions and concerns received and investigated, training and certification status, and other OEC initiatives, and actively engages with the Chief Compliance Officer.

109. Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Individual Defendants had overstated the Company's ability to mitigate macroeconomic

headwinds, particularly those generated by newly imposed tariffs; (2) in light of these headwinds, Dow's ability to maintain its dividend was likewise overstated; and (3) because of external competition and pricing pressures in conjunction with softening demand for Dow products and a consequent glut thereof in global markets, the Individual Defendants had understated the scope and severity of the foregoing on the Company's business and financial health. As a result of the foregoing, Dow's public statements were materially false and/or misleading and lacked a basis in fact at all relevant times.

110. The 2025 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Furthermore, the 2025 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

111. As a result of Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes causing the 2025 Proxy Statement to be false and misleading, the Company shareholders voted, inter alia, to; (1) re-elect Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard,

Dial, Fettig, Hinman, Moreno, Wyant and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve on an advisory basis the compensation of Dow's named executives; and (3) ratify the appointment of Deloitte as the Company's independent registered public accounting firm for 2025.

***April 24, 2025 Press Release***

112. On April 24, 2025, the Company issued a press release in which it reported its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q 2025 Press Release quoted Defendant Fitterling as stating, in relevant part:

> We remain focused on disciplined execution and increased actions to improve profitability and support cash flow . . . . ***Despite ongoing macroeconomic challenges, Team Dow delivered a sixth consecutive quarter of [Y/Y] volume growth while taking actions to reduce costs and right-size capacity . . . . Today's announcements build on Dow's cost actions that are already underway, aiming to further strengthen our financial flexibility and support a balanced capital allocation approach.***

***April 24, 2025 Earnings Call***

113. Also on April 24, 2025, the Company held an earnings call with investors and analysts to discuss its financial results for the first quarter of 2025. During the prepared remarks portion of the call, Defendant Fitterling continued to downplay the scope and severity of the macroeconomic environment's worsening impact on the Company's business and financial health. Defendant Fitterling

simultaneously overstated the Company's ability to withstand the same. A prudent example of such is Defendant Fitterling's statements, in relevant part, that:

> ***[I]n the face of volatile macroeconomic conditions, team Dow focused on operational discipline while taking actions to reduce costs and align capacity to the slower GDP conditions that are impacting our industry. We delivered our sixth consecutive quarter of [Y/Y] volume growth*** . . . . Sequentially, net sales were flat. This reflected lower pricing in industrial intermediates and infrastructure and performance materials and coatings, ***which was offset by downstream growth in silicones as a result of improvements in home and personal care and electronic end markets, as well as seasonally higher demand in building and construction and DIC***.
>
> * * *
>
> As our industry weathers the current challenging conditions, we're executing several proactive and decisive actions to improve margins support near-term cash flow, and optimize our global portfolio. We're doing so today in a manner that is consistent with our best owner mindset and a balanced capital allocation approach. ***Our purpose-built asset footprint and our low-cost feedstock positions primarily in The Americas and The Middle East, create a meaningful cost advantage for Dow and provide industry-leading flexibility to navigate global trade dynamics.*** We're focused on improving our margins by reducing our spending and matching regional supply to profitable demand. As we've outlined throughout today's call, we have line of sight to $6 billion in near-term cash flow improvement.
>
> * * *
>
> The Dow team is closely monitoring the current uncertain macro environment and ***we're taking the necessary actions to further improve our competitive position*** including looking for additional ways to reduce costs, and increase our competitiveness. Our near-term strategic priorities are focused on navigating the challenges our industry is facing. ***By delaying the Alberta project, maintaining financial flexibility, protecting our balance sheet, rationalizing assets in high-cost regions, reducing costs, and focusing on profitable***

> ***growth, we are positioning Dow for long-term success through the cycle.***

114. During the prepared remarks portion of the same call, Defendant Carter similarly spoke about the purported "power of [Dow's] competitive advantages and track record of solid execution in various market conditions," notwithstanding a weak macroeconomic environment and/or tariff-related uncertainties. Specifically, Defendant Carter stated, *inter alia*, that:

> We are moving with urgency to deliver strong operational and financial results through this persistent down cycle. ***We are taking a hard look at everything across the enterprise with a sharp focus on driving volume growth, capturing price, and taking actions in the near term that will enhance profitability and improve margins.*** We will continue to accelerate our cost savings actions and are looking for additional opportunities to build on what we are already delivering.
>
> * * *
>
> ***In addition to the comprehensive set of actions underway, we are adjusting our business to current market realities by leveraging our strategic asset footprint global reach, low-cost position, and unmatched feedstock flexibility. More specifically, we have a leading or low-cost position and world-class manufacturing sites in every geography, with well-developed, agile regional supply chain. And a deep understanding of the needs of our customers.*** And are the only company with integrated polyethylene production on four continents. In addition, ***Dow's unique feedstock flexibility allows us to optimize our assets based on regional advantages. We have the ability to crack the most optimal fee slate. And have the widest range to take advantage of dynamic periods.***
>
> ***This ability to capitalize on preferred feedstocks, paired with our breadth of process technologies, enables Dow to optimize what, where, and how we produce our products*** to best serve our customers. And while the tariff environment remains fluid, we estimate greater than 95% of our North American volume is USMCA [United States–

> Mexico–Canada Agreement] compliant ***which is an advantage for Dow . . . . [W]e have engaged in rigorous scenario planning to identify potential additional cost pressures and mitigation strategies. Altogether, our unmatched cost position and feedstock flexibility superior product mix, and geographic diversity are strong differentiators that give Dow a competitive edge today and throughout the cycle.***

115. During the prepared remarks portion of the call, Defendant Tate similarly represented that the Company was well-positioned to maintain its dividend and profitability despite the larger macroeconomic landscape's uncertainty. In so doing, Defendant Tate stated that "[w]e still expect[ed] demand to be positive for the year," despite "global demand remain[ing] well below historical average GDP levels" and "[r]ecent disruption from tariffs." Defendant Tate continued, stating that "Dow's global footprint with low-cost assets in all regions should position [the Company] well to navigate current market dynamics," and assured investors that "[s]hould [the Company] gain insights into substantial changes during the quarter, [it was] committed to maintaining transparency, and [would] provide timely updates accordingly."

116. Defendant Tate also represented that the Company benefitted from its "important flexibility in the midst of this low-growth environment, and increased macroeconomic and geopolitical uncertainty." Defendant Tate attributed this to the Company's "commitment to financial discipline" and the "proactive actions" the Company was taking "to effectively manage this extended down cycle." These

actions, Defendant Tate represented, were expected to "provide approximately $6 billion in near-term cash support." Defendant Tate continued, stating, *inter alia*, that:

> Our collective actions to navigate the realities of the current macroeconomic environment and deliver $6 billion in cash support over the next two years, enable Dow to maintain our financial flexibility. Our balance sheet remains solid, with no substantive debt maturities due until 2027 . . . .
>
> We will continue to seek options where Dow can proactively take action to improve our capital structure ***through this type of activity or derisking as we've done in the past. We remain focused on delivering on our balanced capital allocation approach over the cycle.***

117. Defendants Fitterling and Carter continued trying to assuage investors' nervousness throughout the rest of the call. During the question-and-answer portion of the call, in response to questions by analysts concerning the impacts of tariffs, Defendant Fitterling stated that:

> We have an advantage in that we have footprint Canada, US, Argentina, Middle East. ***We have the ability to flex the supply chain and to mitigate tariff impacts on where we export our materials.***
>
> ***So it's very positive.*** We also have the advantage that greater than 95% of everything we move between The United States and Canada is USMCA compliant. ***So I think those things will have a positive impact.*** But we just need a little bit better clarity on where these tariffs land and what that impact is on overall demand.
>
> * * *
>
> [We h]ave a very active tariff and trade team that is engaged on all sides of that. And, of course, a lot comes down to what's gonna be on an exemption list, and what isn't gonna be on an exemption list. So we're optimistic that some discussions will start, and we'll get some clarity

> around that as the quarter develops. In the meantime, we're doing things that we need to do to flex that supply chain.

118. Defendant Carter, similarly, stated the following, *inter alia*:

> ***[W]e are well on our way on reconfiguring our supply chain***. The team has been working since really, you know, the middle of the first quarter. On this. ***And so we are able to export quite a bit more product out of Canada. And then, of course, in The United States, our low cost position enables us to produce for the local demand.*** As a matter of fact, the growth project that [Defendant Fitterling] alluded to, Poly seven, that's going to start up in the second quarter is going to provide us even more flexibility to supply even more of that U.S. demand right here. And then, of course, we've got, you know, four on four continents sprayed a polyethylene production. So think about The Middle East as well. ***As an opportunity for us to supply demand around the world but also direct in China***.
>
> ***So we are well positioned. We feel good about where we are. And able to mitigate the tariffs directly.***
>
> * * *
>
> [In] our industrial solutions business . . . , ***although we are seeing softening demand, we are seeing awful pockets of stability***. Markets like energy, home care, and pharma end markets. ***Data centers, an example, is a significant growth opportunity for us***, and our solutions there are used in things like thermal management. I do just, though, just wanna double down the new asset that we're gonna start up there here in the second quarter. In The U.S. For new alkoxylation capacity. That unit is going to focus on growth and attractive end markets for us. So home and personal care and pharma. And, really, the good news around that asset is about 50% of that capacity is already contracted for. ***We expect that to provide us with a tailwind going into the second half.***

119. The statements discussed in ¶¶ 89-102, 112-118 were materially false and/or misleading and/or failed to properly disclose material adverse information when made because, *inter alia*: (1) the Individual Defendants had overstated the

Company's ability to mitigate macroeconomic headwinds, particularly those generated by newly imposed tariffs; (2) in light of these headwinds, Dow's ability to maintain its dividend was likewise overstated; and (3) because of external competition and pricing pressures in conjunction with softening demand for Dow products and a consequent glut thereof in global markets, the Individual Defendants had understated the scope and severity of the foregoing on the Company's business and financial health. As a result of the foregoing, Dow's public statements were materially false and/or misleading and lacked a basis in fact at all relevant times.

## THE TRUTH EMERGES

***July 24, 2025 Press Release***

120. The truth emerged on July 24, 2024 when, before the market opened, the Company issued a Press Release announcing its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release reported a non-GAAP loss per share of $0.42, more than double analysts' consensus expectation of $0.17 or $0.18 lost per share. The Company also reported net sales of only $10.1 billion, a 7.4% decline year-over-year, and which missed consensus estimates by $130 million. This reflect[ed] declines in all operating segments." The Company further reported in the Q2 2025 Press Release that, among other thing, "[s]equentially, net sales were down 3%, as seasonally higher demand in Performance Materials & Coatings was more than offset by declines across the other

operating segments."

121. The Q2 2025 Press Release quoted Defendant Fitterling as stating that these disappointing results were caused by the "lower-for-longer earnings environment that our industry is facing, amplified by recent trade and tariff uncertainties." Defendant Fitterling also disclosed at this time that the Company was "adjusting [its] dividend to ensure [it] maintain[ed] a balanced capital allocation framework," as well as to "provide additional financial flexibility to help guarantee [the Company] maximize[d] shareholder value, both in the current environment and as the industry recovers."

122. The Q2 2025 Press Release further quoted Defendant Fitterling speaking about Dow's outlook for the remainder of 2025. Specifically, the Q2 2025 Press Release quoted Defendant Fitterling as providing a negative outlook, citing "signs of oversupply from newer market entrants who are exporting to various regions at anti-competitive economics," as well as the need for "broader industry engagement and additional regulatory action to restore competitive dynamics."

123. These revelations shocked the investing public. Within approximately one hour of the market's opening on July 24, 2025, multiple analysts voiced their shock at Dow's poor results. A salient example is the report of a Citi analyst, which noted that "[w]hile expectations were already low, DOW's [Q2 2025] earnings came in well below that, as pricing pressure continued to challenge," concluding that the

Company had underperformed even as judged "against a lowered bar." Similarly, an analyst for Vital Knowledge described Dow's results as reported by the Q2 2025 Press Release as "pretty bad" and falling short "across the board." That report stated that the "company didn't come close to earning the dividend."

124. On this news, the price per share of the Company's common stock fell $5.30, or approximately 17.5%, from a closing price of $30.37 per share on July 23, 2025 to a closing price of $25.07 on July 24, 2025.

## DAMAGES TO DOW

125. As a direct and proximate result of the Individual Defendants' conduct, Dow will lose and expend many millions of dollars.

126. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its CEO and Board Chair; its CFO; and its COO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

127. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128. Such expenditures will also include costs incurred in any internal

investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129. As a direct and proximate result of the Individual Defendants' conduct, Dow has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

130. Plaintiff brings this action derivatively and for the benefit of Dow to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Dow, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

131. Dow is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132. Plaintiff is, and has been at all relevant times, a shareholder of Dow. Plaintiff will adequately and fairly represent the interests of Dow in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced

in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

133. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Dow's Board consisted of the following thirteen individuals: Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Liebert, Moreno, Wyant and Yohannes (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to seven of the thirteen Director-Defendants that were on the Board at the time this action was filed.

135. Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability,

are not disinterested, and demand upon them is futile, and thus excused.

136. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Dow to issue materially false and misleading statements. Specifically, the Director-Defendants caused Dow to issue false and misleading statements which were intended to obscure the ineffectiveness of Dow's quality assurance procedures and warranty reserves. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

137. Additional reasons that demand on Defendant Fitterling is futile follow. Defendant Fitterling has served as the Company's CEO and Board Chair, since 2018 and April 2020, respectively, and as a Company director since 2018. The Company provides Defendant Fitterling with his principal occupation, for which he receives handsome compensation for his role at the Company. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant Fitterling conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the

Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Fitterling solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to re-elect himself and Defendants Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Fitterling also signed the false and misleading 2024 10-K. He is also a defendant in the Securities Class Action. For these reasons, too, Defendant Fitterling faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Additional reasons that demand on Defendant Allen is futile follow. Defendant Allen has served as a Company director since 2019. Defendant Allen also serves as a member of the Compensation Committee, of which he has been a member since August 1, 2019, and as Chair of the Corporate Governance Committee since April 9, 2020. Defendant Allen has received and continues to receive handsome compensation for his role as a Company director. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties

to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Allen solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to re-elect himself and Defendants Fitterling, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Allen also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Allen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139. Additional reasons that demand on Defendant Banister is futile follow. Defendant Banister has served as a Company director since 2020. Defendant Banister currently serves as a member of the Compensation Committee, of which he has been a member since August 13, 2020, and as a member of the Corporate Governance Committee, of which he has been a member since April 19, 2025. As a trusted-long time Company director, Defendant Banister conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to

protect corporate assets. Defendant Banister solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to re-elect himself and Defendants Fitterling, Allen, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Banister also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Banister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140. Additional reasons that demand on Defendant Bush is futile follow. Defendant Bush has served as a Company director since 2018. Defendant Bush has also served as a member of the Corporate Governance Committee since April 15, 2021; as a member of the Audit Committee since April 1, 2019; and as a member of the EHST Committee since April 1, 2019. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Bush solicited the 2025 Proxy Statement, which contained false and misleading information and contributed

to, *inter alia* shareholders voting to re-elect himself and Defendants Fitterling, Allen, Banister, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Bush also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Bush breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141. Additional reasons that demand on Defendant Davis is futile follow. Defendant Davis has served as a Company director since 2015. Defendant Davis has also served as a member of the Corporate Governance Committee since April 1, 2019; as a member of the Compensation and Leadership Development Committee since April 10, 2025; and as Chair of the Audit Committee since April 15, 2021, having been a member of the Audit Committee before that time since April 1, 2019. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Davis solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*,

shareholders voting to re-elect himself and Defendants Fitterling, Allen, Banister, Bush, DeVard, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Davis also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142. Additional reasons that demand on Defendant DeVard is futile follow. Defendant DeVard has served as a Company director since 2022. Defendant DeVard has also served as a member of the Audit Committee since April 15, 2021; and as a member of the EHS&T Committee since April 15, 2025. As a trusted-long time Company director, Defendant DeVard conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant DeVard solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to re-elect herself and Defendants Fitterling, Allen, Banister, Bush, Davis, Dial, Fettig, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue

breaching their fiduciary duties to the Company. Defendant DeVard also signed the false and misleading 2024 10-K. For these reasons, too, Defendant DeVard breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

143. Additional reasons that demand on Defendant Dial is futile follow. Defendant Dial has served as a Company director since 2021. Defendant Dial has also served as a member of the Audit Committee since April 15, 2021; and as a member of the EHS&T Committee since April 15, 2021. As a trusted-long time Company director, Defendant Dial conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Dial solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to re-elect herself and Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Fettig, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Dial also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Dial breached her fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon her is futile and, therefore, excused.

144. Additional reasons that demand on Defendant Fettig is futile follow. Defendant Fettig has served as a Company director since 2003. Defendant Fettig has also served as a member of the Corporate Governance Committee since April 1, 2019; and as Chair the Compensation Committee since April 9, 2020, having joined as a member of the Audit Committee on April 1, 2019. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Fettig solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia* shareholders voting to re-elect himself and Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Hinman, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Fettig also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Fettig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145. Additional reasons that demand on Defendant Hinman is futile follow. Defendant Hinman has served as a Company director since 2018. Defendant Hinman has also served as a member of the Corporate Governance Committee since April 15, 2021; as a member of the Compensation and Leadership Development Committee since April 14, 2022; and as Chair the EHS&T Committee since April 15, 2021, having joined as a member of the EHS&T Committee on April 1, 2019. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Hinman solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to reelect herself and Defendants Fitterling Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Moreno, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Hinman also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Hinman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146. Additional reasons that demand on Defendant Liebert is futile follow.

Defendant Liebert has served as a Company director since April 2025. Defendant Libert has also served as a member of the Audit Committee and as a member of the EHS&T Committee since that time. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Liebert breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

147. Additional reasons that demand on Defendant Moreno is futile follow. Defendant Moreno has served as a Company director since 2021. Defendant Moreno has also served as a member of the Compensation and Leadership Development Committee since April 15, 2021; and as a member of the EHS&T Committee since April 15, 2021. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Moreno solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*,

shareholders voting to re-elect himself and Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Wyant, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Moreno also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Moreno breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Wyant is futile follow. Defendant Wyant has served as a Company director since 2020. Defendant Wyant has also served as a member of the Compensation and Leadership Development Committee since April 9, 2020; and as a member of the EHS&T Committee since April 9, 2020. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Wyant solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to re-elect herself and Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, and Yohannes, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue

breaching their fiduciary duties to the Company. Defendant Wyant also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Wyant breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Yohannes is futile follow. Defendant Yohannes has served as a Company director since 2018. Defendant Yohannes has also served as a member of the Corporate Governance Committee since April 10, 2025; and as a member of the Audit Committee since April 1, 2019. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Yohannes solicited the 2025 Proxy Statement, which contained false and misleading information and contributed to, *inter alia*, shareholders voting to re-elect himself and Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, and Wyant, as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Yohannes also signed the false and misleading 2024 10-K. For these reasons, too, Defendant Yohannes breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150. Additional reasons that demand on the Board is futile follow.

151. Defendants Bush, Davis, DeVard, Dial, Liebert, and Yohannes (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

152. Dow has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed

any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Dow any part of the damages Dow suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

153. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

154. The acts complained of herein constitute violations of fiduciary duties owed by Dow's officers and directors, and these acts are incapable of ratification.

155. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the

stockholders of Dow. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Dow, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

156. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Dow to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

157. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least eight of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

158. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

160. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

161. Under the direction and watch of Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes, the 2025

Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, Director Code of Ethics, and the Code of Ethics for Senior Financial Personnel, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

162. The 2025 Proxy Statements also failed to disclose that: (1) the Individual Defendants had overstated the Company's ability to mitigate macroeconomic headwinds, particularly those generated by newly imposed tariffs; (2) in light of these headwinds, Dow's ability to maintain its dividend was likewise overstated; and (3) because of external competition and pricing pressures in conjunction with softening demand for Dow products and a consequent glut thereof in global markets, the Individual Defendants had understated the scope and severity of the foregoing on the Company's business and financial health. As a result of the foregoing, Dow's public statements were materially false and/or misleading and lacked a basis in fact at all relevant times.

163. In exercise of reasonable care, Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes should

have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to the re-elections of Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes, as well as the election of Defendant Liebert for the first time, to the Board.

164. The false and misleading elements of the 2025 Proxy Statement led to, among other things, the re-election of Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes as well as elect Defendant Liebert for the first time, to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company.

165. The Company was damaged as a result of Defendants Fitterling, Allen, Banister, Bush, Davis, DeVard, Dial, Fettig, Hinman, Moreno, Wyant and Yohannes's material misrepresentations and omissions in the 2025 Proxy Statement.

166. Plaintiff, on behalf of Dow, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

167. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Dow's business and affairs.

169. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

170. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Dow.

171. In breach of their fiduciary duties owed to Dow, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Individual Defendants had overstated the Company's ability to mitigate macroeconomic headwinds, particularly those generated by newly imposed tariffs; (2) in light of these headwinds, Dow's ability to maintain its dividend was likewise overstated; and (3) because of external competition and pricing pressures in conjunction with softening demand for Dow products and a consequent glut thereof in global markets, the Individual Defendants had understated the scope and severity of the foregoing on the Company's business and financial health. As a result

of the foregoing, Dow's public statements were materially false and/or misleading and lacked a basis in fact at all relevant times.

172. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

173. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

174. In yet further breach of their fiduciary duties, during the Relevant Period, the Defendant Carter engaged in the lucrative insider sale of Company common stock, netting proceeds of $55,888.

175. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially

inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

176. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Dow has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178. Plaintiff, on behalf of Dow, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

179. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Dow.

181. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Dow that was tied to the performance or artificially inflated valuation of Dow, or

received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

182. Plaintiff, as a shareholder and representative of Dow, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

183. Plaintiff, on behalf of Dow, has no adequate remedy at law.

## FOURTH CLAIM
## Against the Individual Defendants for Abuse of Control

184. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Dow, for which they are legally responsible.

186. As a direct and proximate result of the Individual Defendants' abuse of control, Dow has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187. Plaintiff, on behalf of Dow, has no adequate remedy at law.

## FIFTH CLAIM
## Against the Individual Defendants for Gross Mismanagement

188. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Dow in a manner consistent with the operations of a publicly held corporation.

190. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Dow has sustained and will continue to sustain significant damages.

191. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

192. Plaintiff, on behalf of Dow, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

193. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future

customers who no longer trust the Company and its products.

195. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

196. Plaintiff, on behalf of Dow, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Fitterling, Carter, and Tate for Contribution Under Sections 10(b) and 21D of the Exchange Act

197. Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

198. Dow and Defendants Fitterling, Carter, and Tate, and are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Fitterling's, Carter's, and Tate's, willful and/or reckless violations of their obligations as officers, directors, and/or former officers Dow.

199. Defendants Fitterling, Carter, and Tate, because of their positions of control and authority as officers, directors, and/or former officers of Dow, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Dow, including the wrongful acts complained of herein and in the

Securities Class Action.

200. Accordingly, Defendants Fitterling, Carter, and Tate, are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

201. As such, Dow is entitled to receive all appropriate contribution or indemnification from Defendants Fitterling, Carter, and Tate.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Dow, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Dow;

(c) Determining and awarding to Dow the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Dow and the Individual Defendants to take all

necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Dow and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Dow to nominate at least seven candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Dow restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 18, 2025

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, Jereth Camacho, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15 day of September, 2025.

DocuSigned by:

BDABD82DD7574A3...

Jereth Camacho